CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 11 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

CHRISTOPHER L. BODKIN,    )
       Plaintiff,    )    **Civil Action No. 5:08cv00083**
v.    )
    )    **MEMORANDUM OPINION**
    )
TOWN OF STRASBURG, et al.,    )    **By: Samuel G. Wilson**
       Defendants.    )    **United States District Judge**

Plaintiff, Christopher L. Bodkin, brings this suit against the Town of Strasburg and Strasburg's Chief of Police, Tim Sutherly under 42 U.S.C. § 1983 and against the Town of Strasburg under the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. § 621, *et seq.*, claiming that defendants terminated his employment as a police officer in violation of his constitutional right to due process and on account of his age. Bodkin resigned in lieu of termination for failing to take any action whatsoever following a woman's complaint that she was being stalked by a registered sex offender. Defendants have moved for summary judgment on Bodkin's due process claim on the ground that Bodkin received all the process he was due and on the ground that he voluntarily resigned. The Town of Strasburg has moved for summary judgment on his ADEA claim on the ground that he was threatened with termination for legitimate nondiscriminatory reasons. The court finds that Bodkin has failed to forecast evidence from which a reasonable jury could conclude that his resignation was involuntary or that he was threatened with termination on account of his age. Accordingly, the court grants defendants' motion.

## I.

Bodkin was employed as a police officer with the Town of Strasburg in 1988. In early

2007 Strasburg hired a new Chief of Police, Tim Sutherly. Bodkin had also applied for the position. Bodkin believes that Sutherly may have targeted him for firing because Bodkin applied for the same job. In January of that year, Bodkin had several conversations with Sutherly regarding Bodkin's future career goals with the department. According to Bodkin, Sutherly expressed interest in transferring Bodkin to a different position, and told Bodkin, who was fifty eight[1], that "he had 'been on the road long enough, and paid his dues . . . [and that he should] let the younger guys do it.'" (Plaintiff's Compl. ¶ 10.)

The following month, Sutherly reassigned Bodkin from Corporal to School Resource Officer (SRO), a reassignment that caused Bodkin to lose his rank and, according to Bodkin, "certain compensation for holidays and overtime." (Pl's Compl. ¶ 11.) When the school year ended, Bodkin "reported back to the police station" for further duty. (Pl's Compl. ¶ 18.)

In June 2007, Janice Williams, a town resident, went to the station and reported to Officer Danny Lambert that a man had followed her home on two occasions and "made sexually lewd [and] explicit comments to her." (See Bodkin Dep. 61) Officer Lambert responded by increasing patrols in her neighborhood. Approximately two weeks later, on July 2, 2007, after obtaining some identifying information concerning her stalker, including his first name, a partial address, and the fact that he was a registered sex offender, Williams returned to the station to speak with Lambert. Lambert was not there and Williams spoke with Bodkin instead. Bodkin told Williams that he knew the alleged perpetrator, knew that he was a sex offender, and did not know whether he was dangerous, but that if he bothered her again she should simply call the

---

[1] It is unclear from the complaint whether he was fifty eight at the time of the alleged discrimination in this case, or at the time the complaint was filed, fourteen months later. Either way, defendants do not challenge the sufficiency of his age to sustain an ADEA claim.

2

station, and someone would come to her house. (See Bodkin Dep. 48.) Had he looked into the matter, Bodkin would have learned that the stalker had been convicted of forcible sodomy. (See Bodkin Dep. 52.) When asked "why [he] didn't follow up and look to see if [the stalker] was a violent sex offender," Bodkin responded that he "just never bothered with it" because of Bodkin's self-professed ability to "read people" and that he knew Williams' stalker and did not believe that Williams' stalker was violent. (Bodkin Dep. 65.) Therefore, Bodkin conducted no further investigation, did not write up a police report, or follow up on the complaint in any way. Bodkin has stated that he purposely did not fill out a report because Williams had a history of making other complaints against men that she knew. Bodkin averred that, under the previous police chief, Williams' complaints were considered an annoyance at the department, and were dealt with accordingly.[2]

Later that afternoon Williams filed a complaint against Bodkin for his seemingly lackadaisical handling of her concerns. Sutherly alerted Bodkin to Williams' complaint that evening and, upon further investigation, presented Bodkin with a memorandum charging him with "'[c]onduct which impairs the efficiency and/or reputation of the Strasburg Police Department' while 'working a complaint' on July 2," (Pl's Compl. ¶ 23),[3] and placed him on administrative leave pending further investigation. The memorandum gave Bodkin five days to respond in person or in writing regarding the matter.

On July 6, 2007, at Bodkin's request, Captain Wilkins interviewed Bodkin at the police

_____

[2] The sex offender was later arrested and convicted of stalking based on Williams' complaint.

[3] According to department rules and regulations, this infraction was serious enough to warrant immediate dismissal.

3

headquarters about the allegations. During the interview Wilkins informed Bodkin that a state trooper had also complained about Bodkin's handling of the matter. Though Bodkin was not allowed to review either Williams' or the state trooper's complaints, Bodkin acknowledges that he was aware of the circumstances and the nature of the complaints. During this interview Bodkin did not dispute how he had handled the matter, and he acknowledged that he understood that Williams was concerned about repeated harassment by a registered sex offender with whom Bodkin was familiar. He stated, however, that he "felt [Williams] was just asking for advice" as she had in the past in dealing with her boyfriends and husbands. (Exhibit 4.)

Later that afternoon, Sutherly met with Bodkin and presented him with a memorandum that purportedly terminated his employment effective July 10, 2007, because he had "shirked" his responsibilities and acted in a way that "impaired" the efficiency or reputation of the police department. (See Pl's Compl. ¶ 26.) The memorandum informed Bodkin of his right to appeal to the Town Manager within fifteen days. At the meeting, Sutherly told Bodkin that, if Bodkin preferred, he could resign in lieu of Sutherly firing him.

After returning home that evening and consulting his employment manual, Bodkin became concerned that he might lose his rights under COBRA[4] to extend his health insurance and that he might lose his accrued vacation pay, so he called Sutherly to discuss his possible

---

[4] COBRA is short for the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub, L. No. 99-272 (1986), a law which has been consolidated into various provisions of the U.S. Code that allows qualified beneficiaries of a group health plan to continue their coverage when they would otherwise lose it, as in the case of termination. See Geissal v. Moore Med. Corp., 524 U.S. 74, 76 (1998).

resignation.[5] In that conversation, Sutherly told Bodkin that he would be allowed to back-date his resignation so as to fall within the employment manual's requirements, and therefore keep his vacation pay. Once Bodkin was convinced that he could keep his vacation pay, he ceased to research his health insurance options (Bodkin Dep. 92), and later, on July 9, 2007, after seeking and obtaining assurance from the town manager that he would retain his vacation pay and his rights under COBRA, Bodkin tendered his resignation.

Bodkin consulted with counsel, and two weeks later notified Sutherly that he rescinded his resignation, and wanted a hearing with respect to both his demotion that occurred six months earlier and his "termination." Sutherly and the Town Manager explained that they accepted Bodkin's resignation in good faith and that his time for appeal had expired. Fourteen months later Bodkin commenced this action claiming that defendants had denied him due process in connection with his resignation and had discriminated against him on account of his age.

Defendants moved for summary judgment as to both claims, and the court informed the parties that it intended to grant defendants' motion except as to Bodkin's claim that defendants demoted him in February 2007, on account of his age. Counsel for Bodkin then responded to the ruling in writing as follows:

> Plaintiff has authorized me to admit the following as a matter of record in this case:
> The demotion was not plead or intended to stand as a separate claim apart from the termination. There are no monetary damages flowing directly from the demotion. Plaintiff is not seeking any monetary, equitable, or declaratory relief as a result of the demotion as a matter separate from the

---

[5] "I knew . . . I would be able to have the COBRA if I resigned for up to 18 months. I didn't know if when I was terminated that I would still have the COBRA if I paid for it. Therefore, I needed my vacation pay to be able to pay the $788 a month and to live on." (Bodkin Dep. 89.)

5

termination.

  Plaintiff understands that this admission will affect the Court's final order with respect to its ruling on Defendant's Motion for Summary Judgment.

(Bodkin Letter, Sept. 3, 2009.)

## II.

  Defendants move for summary judgment as to Bodkin's due process claim on the ground that he was afforded sufficient process, and on the ground that he voluntarily resigned, thus relinquishing his property interest in future employment.[6] Bodkin alleges that his resignation was produced by defendants' misrepresentations, and consequently was involuntary. The court finds that Bodkin has failed to forecast sufficient evidence to support the allegation. Accordingly, assuming without deciding that Bodkin had a property interest in continued employment, he voluntarily relinquished that interest when he resigned.

  "[T]o claim entitlement to the protections of the due process clause . . . a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988) (internal citations omitted). "Unless there has been a 'deprivation' by 'state action,' the question of what process is required and whether

---

  [6] Summary judgment is proper "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court views the evidence and makes all reasonable inferences in the light most favorable to the nonmoving party. Sempione v. Provident Bank of Md., 75 F.3d 951, 954 (4th Cir. 1996). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to 'due process' is simply not implicated." Id. Ordinarily, if a Plaintiff resigns "of his own free will even though prompted to do so by . . . his employer, he relinquishe[s] his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause." Id. at 173. If, however, the resignation is "so involuntary that it amount[s] to a constructive discharge, it must be considered a deprivation by state action triggering the protections of the due process clause." Id. A resignation is involuntary when it is obtained either through material misrepresentation, or by duress or coercion. See id. at 174. "[T]he mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion . . . This is so even where the only alternative to resignation is . . . termination for cause, unless the employer actually lacked good cause to believe that grounds for termination existed." Id.

"Under the 'misrepresentation' theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. A misrepresentation is material if it concerns either the consequences of the resignation, or the alternative to resignation. The reliance must be reasonable under the circumstances." Id. (citations omitted).

Bodkin claims that his resignation was involuntary because Sutherly led him to believe that if he did not resign, he would lose his health insurance benefits, that is, his rights under COBRA, and his accrued vacation time. Essentially, he claims that if he had known the truth he would not have resigned. For at least three reasons, however, the evidence, including his own

7

testimony, does not support the claim that his resignation was involuntary.

First, nothing supports his assertion that Sutherly misled him. According to the uncontradicted evidence, if he had not resigned, and his termination had withstood challenge, he certainly would have lost his accrued vacation time. Moreover, when pressed at his deposition, Bodkin conceded that Sutherly did not actually tell him that he would lose his rights under COBRA; rather, it was Bodkin's own interpretation of what was said. (Bodkin Dep. 90) ("[N]o, he did not come straight to my face, but it was the overall picture, the way he made everything sound."). In short, Bodkin points to nothing supporting an objectively reasonable belief that Sutherly told him he would lose those rights. He simply assumed that he would lose them. (See Bodkin Dep. 89.)

Second, and equally fundamental, Bodkin's own testimony shows that he did not in fact rely on what Sutherly told him (other than Sutherly's assurance that he would allow him to back-date his resignation and therefore receive vacation pay) but instead reached the decision to resign independently on his "own." (See Bodkin Dep. 92.) Indeed, Bodkin testified that he did not do any research as to whether he would actually lose his rights under COBRA if he was terminated, although he had three days to do so, because he was satisfied once he understood that he would not lose those rights if he resigned. (Id.) In effect, he decided on "[his] own to turn in his resignation" and accept Sutherly's offer to back-date his resignation so that he would not lose accrued vacation pay which he intended to use to pay for COBRA, secretly intending to "get a lawyer and go from there." (Id.) Nevertheless, before tendering his resignation, he went to see the town manager to assure himself of two things: that he would have insurance, and that he would receive vacation pay. (Bodkin Dep. 81.) The town manager said yes, and Bodkin then

8

gave him his letter of resignation. (Id.) In short, Bodkin made a reasoned, informed choice on factors that were important to him, which is hardly the grist of an involuntary resignation.

Third, Bodkin's own testimony discloses that his assumption that he would lose his COBRA benefits if he was terminated was immaterial to the decision he reached. Furthermore, it would have been objectively unreasonable for him to have relied on an assumption that was in no way grounded in an express representation or misrepresentation. Absolutely nothing precluded Bodkin from researching or simply asking whether he would lose COBRA rights if he was terminated. His failure to do so cannot convert his voluntary resignation into an involuntary resignation. See Stone, 855 F.2d at 176 (finding that the possibility of misrepresentation "is rendered immaterial" when the plaintiff has sufficient time to familiarize himself with the relevant policies, and that less than twenty-four hours was sufficient).[7]

_____

[7] Bodkin's brief attempts to make the case that his resignation was involuntary because it was produced by defendants' alleged misrepresentations. It does not appear that Bodkin attempts to make the case that his resignation was produced by improper duress and coercion although, having cited no case whatsoever, his precise theories are unclear. However, even if Bodkin is arguing that his decision came as the result of duress or coercion, the argument is devoid of factual support.

"Under the 'duress/coercion' theory, a resignation may be found involuntary if on the totality of circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter. Factors to be considered are (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." Stone, 855 F.2d at 174. "[T]he mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion . . . *This is so even where the only alternative to resignation is . . . termination for cause, unless the employer actually lacked good cause to believe that grounds for termination existed.*" Id. (emphasis added). Accord Zepp v. Rehrmann, 79 F.3d 381, 387 (4th Cir. 1996) ("[Plaintiff] was given a choice, albeit an unpleasant one . . . ."); Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995) ("[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination . . . [r]esignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary . . . .").

9

Because Bodkin's resignation was voluntary, he was not entitled to any further process.[8]

Therefore, the court grants defendants' motion for summary judgment on this claim.[9]

## III.

Defendants also move for summary judgment on Bodkin's ADEA claim on the ground

that there is no evidence that defendants threatened Bodkin with termination on account of his

age.[10] The court finds that defendants have proffered a legitimate nondiscriminatory reason for

---

Bodkin admits that he knew what his choices were, that he was allowed to consider them for several days, and that he was even allowed to back-date his resignation so as to receive his vacation pay. Given the clear-cut grounds for termination, the fact that his choice was essentially between the lesser of two evils does not establish impermissible coercion or duress.

[8] Though the court finds that Bodkin's resignation was voluntary, it also appears that Bodkin received all the process that he was due even if he had been terminated. "The essential requirements of due process . . . are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). The notice can be oral or written, and the hearing "need not be elaborate" so long as it provides the employee "an opportunity to present his side of the story." Id. at 545. In this case, Bodkin was presented with both oral and written notice of the charges against him, and he has indicated that he knew the reasons for the complaint. He also requested and received an interview with Captain Wilkins in which Bodkin admitted the substance of the accusations, and was permitted to submit anything that he wished to present. Therefore, Bodkin received all of the process that he would have been due had he not resigned voluntarily.

[9] Bodkin also alleges a due process violation against the Town of Strasburg for failure to train Sutherly regarding the handling of Bodkin's termination. The Supreme Court has held "that if a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation." Collins v. City of Harker Heights, 503 U.S. 115, 123 (1992). Any finding against the Town of Strasburg, therefore, is predicated on a finding that Sutherly violated Bodkin's constitutional rights. Because the court finds that Bodkin was not entitled to procedural due process at the time of his resignation, Sutherly could not have violated Bodkin's due process rights. The Town of Strasburg cannot be held liable for a violation that did not occur. Accordingly, the court grants summary judgment for the Town of Strasburg on Bodkin's failure to train claim.

[10] The court notes that it is highly unlikely that Bodkin's ADEA wrongful termination claim can withstand the determination that his resignation was voluntary. Defendants have not

10

threatening Bodkin with termination – Bodkin's mishandling of Williams' complaint – and Bodkin has offered nothing remotely suggesting that defendants' reason was a mere pretext for age discrimination. Accordingly, the court grants defendants' motion for summary judgment as to the claim.

"To establish a disparate-treatment claim under . . . the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2350 (2009). See also EEOC v. Clay Printing Co., 955 F.2d 936, 940 (4th Cir. 1992) ("In order to establish a cause of action under the ADEA, a plaintiff must demonstrate that but for the employer's motive to discriminate against the plaintiff on the basis of age, the plaintiff would not have been discharged [or demoted]."). A plaintiff can demonstrate that age was the 'but-for' cause in two ways, either by actual evidence of discrimination, or via the McDonnell Douglas burden-shifting framework. See Clay Printing, 955 F.2d at 940-41.

Under the first method, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Gross, 129 S. Ct. at 2351. Under McDonnell-Douglas, the second method, once the employee establishes a prima facie case of discrimination,[11] the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its challenged

---

raised the issue, however, and the parties have not briefed it. Because Bodkin's claim fails under a traditional ADEA analysis as well, the court does not reach the question.

[11] To make out a prima facie case under McDonnell-Douglas, the employee must show that: (1) he is a member of the protected class; (2) he was discharged or suffers an adverse employment action; (3) at the time of the discharge, he was performing at a satisfactory level, meeting his employer's legitimate expectations; and (4) he was treated less favorably than persons not in the protected class. See Clay Printing, 955 F.2d at 941.

11

action.  See McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Although a valid

prima facie case creates a presumption of discrimination, "[t]he ultimate burden of persuading

the trier of fact . . . remains at all times with the plaintiff."  Tex. Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 253-54 (1981).  If the employer satisfies its burden of production, then

the presumption of discrimination established by the prima facie case disappears, and the

employee must show that the employer's proffered reasons were merely a pretext for

discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993);  Rowe v. Marley Co.,

233 F.3d 825, 829 (4th Cir. 2000) ("[P]roving a discrimination claim under [the ADEA] requires

a showing that an employer's asserted non-discriminatory reason for the challenged employment

action is actually a pretext.").

Sutherly's comment in January 2006, in the conversation about transferring Bodkin to

SRO is the only actual age-related evidence that Bodkin marshals in support of his wrongful

"termination" claim.  That comment came nearly six months before his resignation, however,

during an entirely unrelated discussion.  Though, in the light most favorable to Bodkin, the court

found the comment sufficiently related to Bodkin's reassignment claim, such that the court

informed the parties that it intended to deny the Town of Strasburg's motion for summary

judgment as to that claim, it has no probative value in relation to Bodkin's "termination" claim.

The statement is isolated, remote in time, and wholly unrelated to the circumstances that led to

Bodkin's resignation.  "Such isolated, remote statements are not probative of age discrimination

or discriminatory purpose."  Henson v. Liggett Group Inc., 61 F.3d 270, 276 (4th Cir. 1995).  See

also Clay Printing, 955 F.2d at 943 ("The mere existence of a scintilla of evidence in support of

the plaintiff's position will be insufficient; there must be evidence on which the jury could

12

reasonably find for the plaintiff.") (citing <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 252 (1986)). In short, evidence of an isolated, unrelated, stray comment, six months before Bodkin's resignation, is not sufficient to create a question of fact for the jury.

Because Bodkin has not produced sufficient evidence under the first method of proof, the court examines this claim under the burden-shifting framework of <u>McDonnell-Douglas</u>. Assuming that Bodkin can establish a prima facie case of age discrimination under that framework,[12] the burden of producing non-discriminatory evidence shifts to defendants. <u>See</u> <u>Clay Printing</u>, 955 F.2d at 941 ("The employer is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action.") (citations omitted). Here, the defendants provide ample evidence that Bodkin was threatened with termination for non-discriminatory reasons. They assert that Bodkin failed to act in accordance with departmental standards, as interpreted by Sutherly,[13] in his handling of Williams' complaint. "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." <u>Evans v. Tech. Applications &</u> <u>Serv. Co.</u>, 80 F.3d 954, 960 (4th Cir. 1996). Therefore, the defendants have satisfied their burden of production and, to prevail, Bodkin must prove that the stated reasons were only a pretext for underlying age discrimination.

To satisfy the pretext requirement, Bodkin must demonstrate that the "decision to

---

[12] It is far from clear that Bodkin can, indeed, make out a prima facie case. The third prong of the <u>McDonnell Douglas</u> framework requires the Plaintiff to be performing satisfactorily at work. There is significant evidence that Bodkin did not satisfy this requirement.

[13] In regard to an employee's termination, "[i]t is the perception of the decision maker which is relevant," when evaluating whether the termination was for a legitimate, non-discriminatory reason. <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980).

13

terminate [him] . . . was based upon age or that the reasons proffered by [defendants] were simply 'unworthy of credence.'" Clay Printing, 955 F.2d at 944 (citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). In this case, however, there is nothing to suggest that defendants' reasons were pretextual and that Bodkin's age was a determining factor. Instead, the events giving rise to the termination are corroborated by Ms. Williams, and admitted by Bodkin himself.[14] Nothing in the record indicates that age was a factor whatsoever in Bodkin's termination. In fact, the evidence is quite to the contrary.

Bodkin's assertions in no way dispel or avoid the force of the Town of Strasburg's legitimate, non-discriminatory, reason for threatening Bodkin with termination – Bodkin's failure to take any meaningful action whatsoever regarding a citizen's complaint that she was being harassed or stalked by a registered sex offender. It is undisputed that Ms. Williams came to Bodkin to complain that a registered sex offender had been stalking her; that Bodkin was fully aware that the man was indeed a registered sex offender; that he nonetheless summarily dismissed Ms. Williams as a nuisance; and that he failed to even fill out a report, much less investigate the matter. Because Bodkin was threatened with termination for legitimate reasons, and there is a "dearth of evidence to create a triable issue as to whether [he was] . . . dismissed on account of age," the court grants summary judgment on this issue to defendants. Id.[15]

--------

[14] In fact, Bodkin theorizes that he was actually targeted for firing because he had applied for the same job as Sutherly, which of course has nothing to do with age discrimination.

[15] Bodkin's brief details facts but offers scant analysis as to how he believes those facts support his claim that he was terminated on account of his age, or how he believes the court should analyze those facts under a particular proof scheme. In fact, he cites no case whatsoever and suggests no analytical framework.

14

## V.

For the reasons stated, the court grants defendants' motion for summary judgment.

**ENTER:** This 11th day of September, 2009.

_____
United States District Judge